**EXHIBIT B**

**WOODBRIDGE PSYCHOLOGICAL ASSOCIATES, P.C.**

4320 Prince William Parkway
Suite 109
Woodbridge, Virginia 22192

Telephone: 703.680.4200
Facsimile: 703.680.5011
information@wpapc.com

# CONFIDENTIAL
# FORENSIC MENTAL HEALTH EVALUATION

**Name:** Xavier Dejuan Jackson
**Date of Birth:** ▮▮▮▮▮▮▮▮
**Charges:** Production of Child Pornography (2 Counts), Attempted Enticement/Coercion of a Minor, Transportation of a Minor
**Case No:** 1:24-cr-212
**Date of Interview:** January 24, 2025
**Date of Report:** February 4, 2025
**Type of Assessment:** Psychosexual Risk Assessment

## SOURCES OF INFORMATION

In conducting the evaluation, I relied on the following sources of information and assessment measures:

1. Plea Agreement, filed November 21, 2024.
2. Statement of Facts.
3. Clinical interview with Xavier Jackson on January 24, 2025.
4. Sexual History Questionnaire.
5. Static-99R.

## INFORMED CONSENT

I met with Mr. Jackson on January 24, 2025, at the William G. Truesdale Adult Detention Center. He was informed of the nature, scope, and purpose of the evaluation, including the relevant limits of confidentiality and privilege. I explained that a copy of the ensuing report would be sent to his defense attorney, Damon Colbert, Esq., and would likely be shared with the prosecuting attorney and the court. Mr. Jackson stated that he understood these arrangements and agreed to participate in the evaluation.

## IDENTIFYING INFORMATION

Xavier Jackson is a 28-year-old, single, male. Prior to his arrest for the referral offenses, Mr. Jackson was living alone in Reston, Virginia. Prior to his arrest, he was working as a data center technician.

William J. Stejskal, PhD · Rita Romano, LCSW · Claudia Bailey, LCSW · Brandie Bartlett, PsyD
Claudia Carrera, PsyD · Jonathan DeRight, PhD · Karen Fitzgerald, PhD · Travis Flower, JD PhD
Irene Guya-Allen, PhD · Shauna Keller, PsyD · Brian Levine, PsyD · Jennifer Marshall, PhD ·
Sahair Monfared, PsyD · Katherine Robinson, PsyD · Laeli Wilson, PsyD

Mr. Jackson is currently before the court for sentencing on two counts of Production of Child Pornography, one count of Attempted Enticement/Coercion of a Minor, and one count of Transportation of a Minor. Between January 13, 2024, and January 29, 2024, Mr. Jackson engaged in a sexual relationship with Minor 1, who was 17-years-old at the time. Mr. Jackson transported the girl from her home in Maryland to his home in Reston, Virginia, where they were intimate. Mr. Jackson video recorded their sexual encounter.

Additionally, sometime in February of 2024, Mr. Jackson began communicating via Instagram with an individual who claimed to be 18-years-old, Minor 2. Mr. Jackson and Minor 2 moved their conversation to Snapchat and on March 1, 2024, Minor 2 revealed to Mr. Jackson that she was really 14-years-old. Knowing Minor 2's true age, Mr. Jackson engaged in sexual chats with her and requested she send him video recordings of herself nude. Minor 2 sent Mr. Jackson at least two videos and on multiple occasions they discussed plans to meet for the purpose of engaging in sexual acts.

## RELEVANT BACKGROUND INFORMATION

### *Developmental History*
Xavier Jackson was born in Fairfax, Virginia, to Brenda and Alfonso Jackson. Mr. Jackson said that he enjoys a close relationship with his mother. He said that his father rarely shows outward signs of affection, though he knows his father cares for him. Mr. Jackson's parents are married and currently reside in Springfield, Virginia. Mr. Jackson has an older sister, Shanice, who lives in Woodbridge and with whom he is close. He also has an older, paternal half-sister. He has never had contact with this sister.

Mr. Jackson reported having a generally happy childhood and adolescence. He reported being raised in a nice, safe neighborhood in Springfield. His father was enlisted in the United States Air Force for four years and then worked at the U.S. Postal Service for 50 years. Mr. Jackson's mother was employed in financial collections before retiring. Mr. Jackson said that his family had regular contact with extended family members throughout his childhood and adolescence. Mr. Jackson denied witnessing domestic violence during his formative years. He denied ever being abused in any way and said that his parents were able to provide all material necessities for him.

### *Educational History*
Mr. Jackson graduated from West Springfield High School in 2014. He then attended Norfolk State University for three years. He did not complete a degree program. He returned to the Northern Virginia area and studied for one year at Northern Virginia Community College.

### Substance Use History

Mr. Jackson denied ever trying any type of drug. He said that he has consumed a few sips of alcohol in his life. He said that he has never felt the need to use mind altering chemicals. He denied a family history of substance abuse.

### Mental Health

Mr. Jackson's mental health history is unremarkable. He said that he has never participated in outpatient therapy, has never been psychiatrically hospitalized, has never taken psychotropic medications, and has never engaged in suicidal or self-injurious behaviors.

### Medical History

Mr. Jackson reported being fairly healthy. He said that he does not have any current medical conditions and does not require any medications. Mr. Jackson indicated that he has hit his head a few times while playing football in high school. He denied having any other relevant medical history.

### Employment History

Mr. Jackson worked as a data center technician for two years before his arrest for the referral offenses. Prior to that, he worked as an Amazon Prime driver. Prior to that, he was a teller at Wells Fargo for a year and three months. He also worked as a book keeper and front end supervisor at Shopper's Food Warehouse and as a checkout supervisor at Giant. In addition to his full time employment, Mr. Jackson was also employed as an assistant music director for a church. This was a part-time, paid position he held for 12 years. Mr. Jackson has never enlisted in any branch of the military.

### Legal History

In 2020, Mr. Jackson was arrested in Fairfax, Virginia. He was charged with Solicitation of a Minor and Attempted Indecent Liberties with a Minor. These charges are related to the allegation that Mr. Jackson communicated online with an individual he believed to be a 15-year-old female and allegedly made plans to meet with her in person for the purpose of engaging in sexual acts. These charges were dismissed in 2022.

### Social History

Mr. Jackson has never been married and he has no children. Mr. Jackson is not currently in a romantic relationship. During the clinical interview he stated that he has, "a very short social battery." While he said that he does have friends and social supports, he said that he also enjoys his time alone.

### Sexual and Dating History

Mr. Jackson identified as heterosexual and said that he is comfortable with his sexuality. He said that he learned about sex in his fifth grade sexual education class. He denied engaging in any type of sexual play or experimentation as a child. Mr. Jackson said that his father had a talk with him about sex when he was 13-years-old. This conversation consisted of the elder Mr. Jackson saying, "don't

bring back any babies," and, "you know how to treat a woman." Mr. Jackson said that his mother did not have an actual conversation with him about sex, though she did place condoms in his guitar case prior to him leaving for college.

Mr. Jackson started going through puberty at about 13-years-old and that he started masturbating at about 16. He stated that the most he has ever masturbated in one day has been three times. He said that, prior to his arrest, he was masturbating approximately three times per month. He has not masturbated since being incarcerated. Mr. Jackson was asked about various types of potential sexual partners and different sexual acts to gage his sexual interests. He indicated that he is aroused by attractive teenage girls, "rough" consensual sex, missionary style sex, and oral sex. He said that he is particularly aroused by females who have large behinds, as well as Asian and Hispanic women. Mr. Jackson denied being aroused by prepubescent children or tweens. He said that his preferred age range for a sexual partner would be someone between the ages of 18 and 30.

Mr. Jackson stated that he first looked at pornography when he was in the fifth grade and a friend showed him Hentai. He said that the longest he has ever looked at pornography in one day has been for about one hour. Mr. Jackson described his use of pornography over the course of his life as being occasional. He estimated that the last time he saw any type of pornography was in May of 2024. Mr. Jackson said that the type of pornography he found to be most arousing is material featuring biracial, heterosexual adult couples.

Mr. Jackson said that he started dating when he was about 13-years-old. He said he has been fairly successful dating, stating, "sometimes you date good partners and it ends, sometimes it crashes and burns. But most of the people I dated I still speak to." Mr. Jackson indicated that he has been in three serious relationships over the course of his life. His first meaningful relationship was with a woman named Tish. Mr. Jackson was about 23 or 24 when they dated and she was a year older. Their relationship lasted about a year-and-a-half. His next serious relationship was with a woman named Thema. She was 19 and he was 26 when they began dating. Their relationship lasted nearly one year. Mr. Jackson's most recent meaningful relationship was with a woman named CJ. Mr. Jackson was three years older than CJ and they dated on-and-off since 2019.

Mr. Jackson had sex for the first time when he was 19. His partner was a 19-year-old female that he met via Kik. He said that, although their romantic connection did not work out, he and the woman remained friends for a few years. Mr. Jackson estimated having sex with nine women over the course of his life. He said that two of his relationships have been one-night-stand encounters. All other sexual relationships have been with someone he had been dating. Mr. Jackson has never lived with a romantic partner. He said that none of his partners have ever complained about his sexual attitudes or behaviors. He denied ever having sex with a prostitute. Mr. Jackson said that he once contracted Syphilis, but that he received treatment. Prior to his arrest he was not in a relationship. He said his ideal frequency of sexual activity would be three to four times per week.

During the interview Mr. Jackson said that he is not aroused by children, by young teens, or by undeveloped physical characteristics. He denied engaging in or fantasizing about sexual behaviors that would be suggestive of a sexual disorder such as exhibitionism, voyeurism, or fetishism. He denied being aroused by causing pain to a sexual partner and does not seem aroused by being hurt or humiliated during sex. He said that he is not aroused by forcing himself on a non-consenting partner. He denied engaging in, or being aroused by, any other type of problematic sexual behaviors that have not already been mentioned.

### *Version of the Alleged Offense from Attachment A*
The following is taken directly from the Statement of Facts:

> …The defendant virtually met Minor Victim 1 on a social media application in January 2024. The two had no history, social connection, or other link to one another. Minor Victim 1 revealed to the defendant she lived with her parents, went to high school, and was seventeen years old. The defendant annotated Minor Victim1's birthday in his cell phone's InkPad application under a "note" titled Minor Victim 1's name; next to the numbered month and day of her months-away birthday, he wrote, "18."

> The defendant transported Minor Victim 1 across state lines to engage in sexual activity with him. The defendant traveled in his vehicle from his residence in Reston, Virginia to pick up Minor Victim 1 either at her parent's home or at her high school, both of which were located in Maryland.

> Each time the defendant engaged in sexual activity with Minor Victim 1, he recorded it on his Samsung Galaxy S23 Ultra cell phone. The defendant then distributed the videos he produced to Minor Vicim 1 via Snapchat.

> The defendant first transported Minor Victim 1 from her Maryland residence to his Virginia apartment for sexual activity on January 16, 2024. He drove approximately 40 minutes from his Reston apartment to the home Minor Victim 1 lives in with her mother, then transported her the 40 minutes back to his apartment. There, he escorted Minor Victim 1 directly to his room where he had set up a ring light in front of his bed, and he placed his Samsung Galaxy S23 Ultra on an awaiting tripod. The defendant recorded two videos and created at least one image file of his sexual activity with Minor Victim 1 during this encounter…

> The defendant's communication with Minor Victim 2 originated on Instagram in February 2024. The two had no history, social connection, or other link to one another. On or about March 1, 2024, the communication migrated to Snapchat.

On March 1, 2024, Minor Victim 2 confessed to the defendant they were not eighteen years old, as they previously told him. The defendant inquired how old they were, to which Minor Victim 2 said, "I'm 14, I mean it's not that bad!" He replied, "Oh this explains some things. Sw were gonna let me fuck you and never tell me your real age? I'm not mad btw just asking a question…So you aren't tryna set me up or anything right?" The defendant soon after disclosed he "had [his] suspicions." When Minor Victim 2 asked how old he suspected they were, the defendant replied, ":ole 17 maybe 16 but that was a stretch and ya it's not too hard when you know what to look for."

Within minutes of Minor Victim 2 revealing they were 14 years old, the defendant resumed sexually explicit banter with them. Minor Victim 2 explained they would still like to have sex with the defendant as they had previously discussed, but they wanted him to "be comfortable." He said, "Never said I wasn't, but now I wanna hear you bed to get fucked by me whether on video or audio message… And I still wanna see you naked too." And Minor Victim 2 paused the conversation for five minutes because their mom was asking for them, they asked if he still wanted the audio message. He replied, "Yep thanks and can I still see you nude?"

Minor Victim 2 sent the defendant a voice message breathing heavy and begging him to do sexual things to them. At 10:05 PM, he replied, "Thought you were gonna make that a video..." Minor Victim 2 then sent a video at 10:08 PM of them caressing their breasts and touching their exposed vagina. Metadata from Minor Victim 2's cell phone shows that particular video was created on their phone at 10:06 PM.

After they sent the first video, the defendant asked, "Can I see your ass too?" Minor Victim 2 then sent a video at 10:21 PM of them spreading their buttocks. The same turquoise undergarments from the video minutes before were visible in this second video. Metadata from their cell phone shows that particular video was created on their phone at 10:20 PM. The defendant received both of these videos via the Snapchat application on his Samsung Galaxy S23 Ultra cell phone.

To this video, the defendant complained: "Can you like stand up so I can see a better view of it is a little dark sorry." Minor Victim 2 said, "I can't right now but maybe late?" The defendant assured them, "Yep that's fine babe also you been lying cause I like your body your boobs look good and Imma definitely end up stretching that pussy cause it looks small and tight."

The defendant received these videos via Snapchat and stored them in a folder titled

Minor Victim 2's name on his Samsung Galaxy S23 Ultra cell phone. Also stored within that folder were three videos depicting Minor Victim 2 engaged in sexual activity, which he received on or about June 23, 2024.

On March 2, 2024, the defendant asked Minor Victim 2 to meet in person for sexual activity. Over the next several days, the two discuss potential opportunities. Minor Victim 2 expressed fear of embarrassing herself, making mistakes during sexual activity, and concern over being "useless and ugly." The defendant assured her she was beautiful.

Five days later, the defendant again inquired when Minor Victim 2 would meet him in person for sexual activity. Minor Victim 2 proposed the forthcoming weekend. The two discussed Minor Victim 2 sneaking out and their status as a virgin, and the defendant assured them, "Nah you'd be the 2nd virgin I'd fuck lol but I mean while I'm fucking you I won't be fucking anyone else fr." Minor Victim 2 excitedly responded, "Wait really? That's so nice!! Thank you." The defendant continued to press Minor Victim 2 for her address. She said, "Okay just don't murder me," to which he replied, 'Never I'm only tryna kill that pussy with my dick lol." After Minor Victim 2 provided their address, he said, "You're a little farther than I thought but it's cool thanks."

For months thereafter, the defendant and Minor Victim 2 engaged in sexual banter, exchanged sexually explicit photos, and discussed various ultimately unfulfilled plans to meet in person for sexual activity. They discuss locations the defendant could pick Minor Victim 2, including her specific high school or a mall near her parent's house.

On June 23, 2024, Minor Victim 2 asked the defendant when he would next be available to meet up for sexual activity. He replied in a week and a half because he would be out of the country. He was arrested on July 1, 2024 coming back from that trip out of the country…

### *Mr. Jacksons Version of the Offenses*

During the clinical interview Mr. Jackson provided a version of the events that is generally consistent with the version outlined by the government.

## CLINICAL ASSESSMENT AND RESULTS

### *Clinical Interview and Mental Status Exam*

Mr. Jackson was interviewed at the William G. Truesdale Adult Detention Center on January 24, 2025. He wore facility-issued clothing and was well groomed. Mr. Jackson stated that he stands five feet and eight inches tall. He was of average weight for his height. He appeared his stated age.

Mr. Jackson was alert and aware of the evaluation process. His speech was of normal rhythm and volume. His statements were goal-directed, logical, and intentional. Mr. Jackson's memory and concentration were good. He did not display any unusual psychomotor activity. Mr. Jackson was polite and calm. Despite his current legal situation, he had a surprisingly positive attitude throughout the interview. Mr. Jackson demonstrated an appropriate range of affect. He appeared to be functioning in the Average range of intellectual functioning, due to his vocabulary, level of concept formation, and occupational attainment. His insight and judgment at the time of the interview were good.

When asked about his mental status at the time of interview, Mr. Jackson stated, "Aside from being in here (jail), I'm alright." Mr. Jackson denied experiencing any symptoms of mental illness. He denied experiencing auditory or visual hallucinations and did not appear to be responding to internal stimuli at the time of the interview. Mr. Jackson did not appear to harbor any deluded thoughts or beliefs. He denied experiencing suicidal ideation.

### Diagnostic Impressions

Diagnostic criteria are drawn from the *Diagnostic and Statistical Manual-Fifth Edition-Text Revision (DSM-5-TR),* published by the American Psychiatric Association. The DSM-5-TR is the primary text documenting the characteristic criteria of psychiatric, or mental health, disorders. It lists and describes psychiatric conditions, and details the criteria necessary to warrant the diagnosis of each condition, in order to facilitate clear, uniform definitions across professionals in varied research and practice contexts. Regarding psychiatric conditions, Mr. Jackson does not appear to meet criteria for a diagnosis of any mental health disorder.

Of course, any forensic evaluation related to a sexual offense must consider diagnoses related to Paraphilic Disorders, or sexual behaviors. According to the DSM-5-TR,

> "The term paraphilia denotes any intense and persistent sexual interest other than sexual interest in genital stimulation or preparatory fondling with phenotypically normal, physically mature, consenting human partners... Some paraphilias concern the individual's erotic activities, and others primarily concern the individual's erotic targets…A *paraphilic disorder* is a paraphilia that is currently causing distress or impairment to the individual or … has entailed personal harm, or risk of harm, to others."

Because Mr. Jackson engaged in sexual conversations and asked for nude video recordings of a 14-year-old, it is necessary to consider whether or not he would meet criteria for *Pedophilic Disorder,* which is a Paraphilic Disorder. According to the DSM-5-TR, a diagnosis of *Pedophilic Disorder* requires all of the following criteria:

a) Over a period of at least six months, recurrent, intense, sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age thirteen years or younger), and b) the individual has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty, and c) The individual is at least sixteen years and at least five years older than the child or children in Criterion A.

Pedophilic Disorder refers specifically to sexual attraction of an adult to a prepubescent child. It is the undeveloped physical characteristics that attract those with Pedophilic Disorder to children (e.g. no pubic hair, no breast development in females, no thinning of the waist and broadening of the hips in females, high pitched voice in males, etc.). Traditionally, the DSM and Sex Offender Treatment field have used the age of 13 as the cut-off point between prepubescent and pubescent because that is the age by which most individuals have entered into puberty. However, over the past several decades, children have started sexually developing at younger ages. In 2022, it is not uncommon to see a 10 or 11-year-old female developing breasts, growing pubic hair, and starting menstruation. The age at which females typically begin puberty also is affected by race and ethnicity. African American females typically enter into puberty earlier than Caucasians, Hispanics, or Asians. According to a study published by the National Library of Medicine, "Most girls enter puberty between age 8 and 13 years, while boys enter puberty from age 10 to 15 years."[1] For that reason, the age of 13 has become more of a general age baseline, particularly for female victims; if the victim is 13-years-old or older, she is considered pubescent. If the victim is between the ages of 10 and 13, the evaluator must use clinical judgment to determine whether the victim would fall into the pubescent or prepubescent category.

Another aspect that must be considered when determining whether or not a defendant meets criteria for Pedophilic Disorder is the length of time he has demonstrated arousal to prepubescent children or engaged in sexual acts with children. The diagnostic criteria indicates that the defendant must demonstrate prepubescent arousal for at least six months to be considered for the disorder. This means that individuals who have sexual contact with a prepubescent child once, or even multiple times over a short period of time, would not meet full criteria for Pedophilic Disorder, unless they also engaged in other behavior that would suggest arousal to young children.

With regard to Mr. Jackson's case, he engaged in a sexual relationship with a 17-year-old and he asked for nude video recordings of a 14-year-old. Both of these minors would be considered pubescent. During the clinical interview Mr. Jackson denied being aroused by prepubescent physical features. He reported being aroused by normal, healthy sexual fantasies. There is no other evidence to suggest that he is aroused by young children. Therefore, I would not diagnose him with Pedophilic Disorder.

---

[1] Soliman, A., De Sanctis, V., and Elalaily, R. (2014)

***Assessment of Sexual Recidivism Risk***: ***Scores from Relevant Instruments***
<u>*Overview of Risk Assessment with Actuarial Measures*</u>:
When estimating the recidivism risk for an individual offender, it is typically best to begin by considering group data. In other words, we can make better judgments about an individual offender's recidivism risk if we know the rates of recidivism among similar offenders from the same population. Usually, *actuarial measures*—developed through research studies that follow large groups of offenders—are useful in providing estimates of re-offense rates among offenders with particular characteristics or risk factors. Research shows that well-established actuarial measures, such as the Static-99R, can assess risk more accurately than unstructured clinical judgment alone, and best practices in forensic psychology tend to emphasize administering these measures, when appropriate.

<u>***Results and Implications of Mr. Jackson's score on the Static-99R:***</u>
The Static-99R is the most widely used and empirically validated risk assessment measure to determine risk for sexual recidivism. The Static-99R may be used on males aged 18 and over who have been convicted of or accused of committing certain types of sexual offenses. It is comprised of 10 items, two of which are scored on a likert scale, and the remaining eight which are scored either yes or no. Scores range from -3 to 12 and are divided into the following descriptive categories: Very Low Risk, Below Average Risk, Average Risk, Above Average Risk, Well Above Average Risk. The reoffense risk categories describe the offender's risk for reoffending compared to others convicted of sexual offenses, not compared to the general public. Specific reoffense risk estimates are provided for five, 10, and 20 year follow-up periods.

Based on the evaluation and review of Mr. Jackson's record, he appears to warrant a score of 2 on the Static-99R.[2] According to the Static-99R developers, Mr. Jackson's total score of 2 places him in the "Average Risk" category for being charged or convicted of another sexual offense.  On the Static-99R, he received points for items related to never having lived with a romantic partner, having two prior sexual offense charges (in Fairfax 2020), and perpetrating an offense against an unrelated victim. He earned on negative point, thereby reducing his score to 2, for his anticipated age at release from incarceration. In the most recent Static-99R norm sample, 4.6% of men with the same score as Mr. Jackson went on to sexually reoffend during a five-year follow-up period (or, stated differently, about 95 per 100 men with the same score were not known to reoffend). Over a 10 year follow-up period of time, 7.2% of men with the same score as Mr. Jackson went on to sexually reoffend. Over a 20 year follow-up period of time, 8.9% of men with a score of 2 went on to sexually reoffend. Very little sexual recidivism appears to occur after a 20 year follow-up so the 20 year rate can be regarded as very close to a "lifetime rate" (Hanson, Harris, et al., 2018). Mr. Jackson's Static-99R score was

---

[2] An important aspect in determining one's Static-99R score is age at release from incarceration. Mr. Jackson has yet to be sentenced for this case. However, during the clinical interview he informed me that the guidelines for his case are 30 plus years incarceration. Therefore, his estimated age at release from incarceration is calculated to be 58. If Mr. Jackson were to be sentenced to less than 11 years incarceration, his Static-99R score would be slightly higher.

interpreted using the Routine Corrections normative group, which is considered the most representative sample of the complete population of sexual offenders.

Of course, a score from the Static-99R (or any measure) does not indicate whether the individual who received that score will or will not sexually reoffend; the score only compares the person to other offenders who share certain characteristics. Therefore, the score is a reasonable starting point in assessment, and can be used to place the person in a risk category, but is not a prediction specific to that individual, who must be considered in the context of his own circumstances, characteristics, and resources.

*Risk Assessment: Additional Considerations*

Most generally, there are two broad sets of risk factors associated with sexual-offense recidivism. These factors relate to a) an impulsive, antisocial lifestyle, and b) sexual deviance.

The first set of risk factors involves a general pattern of antisocial personality, antisocial behavior, and lifestyle instability. Typically, this includes a history of excessive use of alcohol or drugs, an extensive criminal history, frequent moves from place to place, lack of interpersonal relationships, employment instability, and an attitude demonstrating a general lack of regard for the rights and autonomy of others. From the information provided to me for this evaluation, Mr. Jackson does not demonstrate these qualities. Mr. Jackson indicated that he has never used drugs and rarely consumed alcohol. He does not have any drug or alcohol related criminal offenses such as Drunk in Public or Driving Under the Influence which would refute his claim regarding his use of drugs and alcohol. Mr. Jackson does not have a lengthy criminal history. He has not moved about aimlessly as an adult. He has friends and family members on whom he can rely for support. He has demonstrated a degree of employment stability as he worked as a church assistant music director for 12 years. Most importantly, Mr. Jackson appears capable of demonstrating empathy, respect, and concern for others.

The second broad risk factor, and the factor most closely associated with sexual reoffense, is often termed "sexual deviance." Deviant interests usually refer to a pattern of documented, demonstrated interest in sexual behaviors that are illegal, most often sex with prepubescent children or rape. As previously mentioned in this report, Mr. Jackson has not demonstrated a repeated pattern of sexual arousal to young children and he does not meet criteria for a diagnosis of Pedophilic Disorder. He denied being aroused by any other sexually deviant themes. There is no evidence available to me which would contradict Mr. Jackson's self-report. Therefore, he does not demonstrate this risk factor either.

**CONCLUSIONS**

Xavier Jackson presented as a cooperative, personable young adult. He was born in Fairfax and raised in Springfield, Virginia, along with his older sister. He reported having good relationships with his

parents and sister. Mr. Jackson seems to have had a relatively normal, happy childhood and adolescence. He graduated from high school in 2014 and went on to study at Norfolk State University for three years. He left Norfolk State and returned to the Northern Virginia area where he studied for one year at Northern Virginia Community College. Mr. Jackson then began working full time. He worked at Shoppers Food Warehouse, Wells Fargo, and Amazon Prime before moving in to a position as a data center technician. Mr. Jackson does not appear to have a substance abuse problem. He does not have medical or mental health concerns. He is not married and has no children. Mr. Jackson seems to have lived a relatively stable life prior to his arrest for the referral offenses.

With respect to his sexual history, Mr. Jackson's sexual development appears to have followed a relatively normal trajectory. He learned about sex in fifth grade in a sexual education class. His parents did not have in depth conversations with him regarding sex, though his father did caution him against impregnating anyone at a young age. It seems as though Mr. Jackson would have felt comfortable speaking with his parents if he ever had any questions regarding sex. Mr. Jackson started puberty and started masturbating at about the same time as his peers. He indicated that he has watched pornography occasionally over the course of his life and that his favorite type of pornography is material featuring biracial, heterosexual adults. Mr. Jackson had sex for the first time when he was 19 with a same-aged female he met on Kik. Mr. Jackson reported having nine sexual partners in his lifetime. Though he is only 28-years-old, it appears that he has formed at least three long-term, mutually satisfying, romantic relationships. Mr. Jackson does not seem to be hypersexual, though he does demonstrate a degree of sexual impulsivity which contributed to his offense conduct. Mr. Jackson does not appear to be aroused by deviant sexual acts and he did not demonstrate any sex offense-permissive beliefs.

With respect to formal risk assessment, Mr. Jackson was evaluated with the Static-99R, which is the gold star standard for sexual risk assessment. On this measure he earned a score of 2, which is in the Average range of sexual reoffense risk, compared to others convicted of sexual offenses. Other factors that have been correlated with sexual reoffense include evidence of sexually deviant interests and evidence of an antisocial, criminal lifestyle orientation. Mr. Jackson does not demonstrate either of these factors. From all available information, and from formal risk assessment, it is my clinical opinion that the Static-99R accurately estimates Mr. Jackson's actual risk for recidivism, which I believe to be **average risk**.

## RECOMMENDATIONS

Based on the factors mentioned in this report the following recommendations are made:

1) *Therapy Specific to Sexual Behavior Problems:* Research suggests that individuals who successfully complete sex-offense-specific therapy tend to be at slightly lower risk to reoffend. Mr. Jackson would benefit from psychotherapy with a clinician who has experience working with men

*Jackson, Xavier*
*1:24-cr-212*
*February 4, 2025*
*13 of 13*

who sexually offend or have other sexual behavior problems. These services should focus on healthy sexuality and healthy relationships.

2) *Restricted Internet Access:* Mr. Jackson should be prohibited from using online dating platforms and applications such as TikTok, Instagram, Snapchat, and other social media sites used overwhelmingly by minors. His electronic devices should be equipped with software to ensure his compliance.

3) *Continue to Refrain from Consuming Drugs or Alcohol:* When he is released from incarceration, Mr. Jackson should continue to refrain from using any mind-altering substances.

This report is based on the information available at the time of writing, that is, the records listed earlier in this report. Should additional relevant information become available, my opinions are subject to modification. Please do not hesitate to contact me should you have any additional questions.

Katherine Robinson, Psy.D., CSOTP
Licensed Clinical Psychologist
Certified Sex Offender Treatment Provider

**REFERENCES**

Hanson, R. K., Harris, A. J. R., Letourneau, E., Helmus, L. M., & Thornton, D. (2018). Reductions in risk based on time offense-free in the community: Once a sexual offender, not always a sexual offender. Psychology, Public Policy, and Law, 24(1), 48–63. doi:10.1037/law0000135

Soliman, A., De Sanctis, V., and Elalaily, R. (2014). Nutrition and pubertal development. Indian Journal of Endocrinology and Metabolism. 2014 Nov; 18(Suppl 1): S39–S47.